# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Axon Enterprise, Inc.,

      Plaintiff

v.

Luxury Home Buyers, LLC,

      Defendant

Case No.: 2:20-cv-01344-JAD-VCF

**Order Granting in Part and Denying in Part Cross-Motions for Summary Judgment**

[ECF Nos. 59, 61]

Axon Enterprise, Inc. makes and sells the Taser® brand of non-lethal weapons. Luxury Home Buyers, LLC (LHB) is a former distributor of Tasers but currently operates a business selling used Tasers that its owner refurbishes in his home workshop. Axon sues LHB for violating its intellectual-property rights in its registered "Taser" word and design marks and for holding Taser-related domain names for ransom. Axon brings four trademark claims under the federal Lanham Act and one claim for deceptive trade practices under Nevada law, seeking injunctive relief and money damages.

Both parties move for summary judgment. LHB argues that it is entitled to judgment on all claims because Axon can't prove that the use of Axon's marks confused consumers, Axon's mark has not been rendered generic, LHB made any false representations, and LHB acted in bad faith when it registered domain names containing Axon's marks. Axon takes the converse position: the undisputed evidence shows confusion, false advertising, and bad-faith domain registration.

I grant summary judgment on LHB's genericness defense because LHB did not carry its burden to show that the term "Taser" has come to mean the entire class of conducted-energy weapons, and not just those bearing the Taser name, and I grant judgment in favor of Axon on

the part of its false-advertising claim over LHB's statements of affiliation with Axon.  But I grant summary judgment on the portion of Axon's false-advertising claim for statements LHB made about the superiority of the Taser X26E model.  So this case proceeds to trial on Axon's claims for trademark infringement; false designation of origin; cybersquatting; false advertising based on refurbishment-quality statements; and deceptive trade practices as to logo-and-mark-use, quality-of-goods, and product superiority/disparagement issues.  But first, I order the parties to a mandatory settlement conference with the magistrate judge.

## Background[1]

### I.      Axon produces Tasers and owns the intellectual-property rights in the name and logo.

Axon Enterprise, Inc., formerly Taser International, Inc., is the "world's leading manufacturer of Conducted Energy Weapons" (CEWs).  It produces non-lethal electric weapons for law enforcement, private security, and military agencies and has sold more than 1 million CEWs across 107 countries.[2]  Axon's best-known model from 2003 until its production ceased in 2014 was the Taser X26E CEW, but the company has since produced the newer Taser X2 and X26P models.[3]  Axon owns four valid, federally registered trademarks: two standard "Taser" character marks for CEWs and CEW cartridges, the stylized "Taser" name mark, and the design mark for Axon's "Globe Lightning Bolt Logo."[4]

---

[1] ECF No. 1 at ¶ 1.

[2] *Id.*

[3] *Id.* at ¶ 8, 15.

[4] *Id.* at ¶¶ 19–27.

## II.    A former Taser distributor, Wenger now refurbishes used Tasers through LHB and its subsidiaries.

Jeffrey Wenger founded LHB in 1994.[5]  Since 2006, LHB's sole business has been selling used and refurbished Axon Tasers.[6]  LHB owns and conducts business through multiple subsidiaries such as Accredited Security, Accredited Safety, and Mister Stungun.[7]  Sometime in 1995, Axon designated LHB as an authorized Taser distributor[8] and, shortly thereafter, Wenger registered various domain names including taser.org and tasers.org to help it market Tasers online.[9]  LHB currently owns 64 domain names containing references to Taser or Axon Taser models.[10]  And while neither party knows exactly when their distributor relationship ended, they agree that it ceased sometime around 2000.[11]

On its websites, emails, and advertising mailers, LHB uses Axon's Taser character, stylized word, and design marks, often in proximity to its own marks.[12]  On several of its websites, LHB also makes representations that it is an "Authorized TASER® Distributor" and that "TASER® is a Trademark of the Mister Stungun."[13]  Its marketing also focuses on the superiority of the Taser X26E CEW over other models, stating that the X26E "wield[s] the highest degree of takedown power of total and absolutely unsurpassed effectiveness[;]" "offers

---

[5] ECF No. 59 at 3.

[6] ECF No. 61 at 2; ECF No. 61-1 at 12–13.

[7] ECF No. 1 at ¶ 28; ECF No. 59 at 2; ECF No. 61 at 3.

[8] ECF No. 59 at 3; ECF No. 67 at 10.

[9] ECF No. 64 at 17–18; ECF No. 64-2 at 21.

[10] ECF No. 1 at ¶¶ 42–43.

[11] ECF No. 61 at 7; ECF No. 64-2 at 75–76 (Wenger stating that LHB's partnership with Axon ended "some 20 years ago").

[12] ECF No. 1 at ¶¶ 29–34.

[13] *Id.* at ¶ 30, 33.

the highest degree of takedown power ever available with the same level of safety[;]" "has the most powerful technology and stopping force[;] "lasts for over 20 years—and works every time[;]" and has "twice the power" of the X26P CEW.[14]  LHB also advertises that its products are "factory refurbished," "professionally refurbished," "thoroughly tested," "refurbished to the highest standard," "completely refurbished" to "work like new," "even better than new," and reprogrammed "with the latest software."[15]

Axon sues LHB for trademark infringement, false advertising, deceptive trade practices, and cybersquatting—all stemming from LHB's use of the Taser marks, its advertising statements, and ownership of domains containing Axon's marks.  The parties cross-move for summary judgment on all claims.

**Discussion**

## I.     Summary-judgment standard

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[16]  The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[17]  If the moving party satisfies its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[18]  "When simultaneous cross-motions for

---

[14] ECF No. 64 at 21–24.

[15] ECF No. 1 at ¶ 39.

[16] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[17] *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

[18] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[19]

## II.   Axon's trademark-infringement and false-designation-of-origin claims proceed to trial unburdened by LHB's genericide defense.[20]

For a plaintiff to prevail on a trademark-infringement claim, it must show that (1) it has a "protectible ownership interest in the mark" and (2) "the defendant's use of the mark is likely to cause consumer confusion."[21]  "Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena."[22]  The parties' dispute on these claims centers on two issues: whether "Taser" is no longer protectible because it has become a generic mark and whether LHB's nominative use of Axon's marks is likely to cause consumer confusion.

### A.   Axon is entitled to summary-judgment on LHB's genericide defense.

A trademark can lose its protection if it becomes a "victim of genericide[,]" which "occurs when the public appropriates a trademark and uses it as a generic name for particular

---

[19] *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)).

[20]  I analyze Axon's trademark-infringement and false-designation-of-origin claims together because "a claim for false designation of origin under 15 U.S.C. § 1125 requires proof of the same elements as a claim for trademark infringement under 15 U.S.C. § 1114." *Brookfield Commc'ns, Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1046 n.6 (9th Cir. 1999).

[21] *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011).

[22] *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012) (quoting *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999)).

types of goods or services irrespective of its source,"[23] like "aspirin," "cellophane," and "escalator."[24]  But the public's occasional use of a trademark to describe a unique product is insufficient; a mark is only rendered generic and stripped of its protections when "the primary significance of the term in the minds of the consuming public is now the product and not the producer."[25]  When a trademark action involves a federally registered mark, that mark is given "a strong presumption of validity" that also "includes the specific presumption that the trademark is not generic."[26]  The burden to prove that a registered mark is generic thus falls on the defendant.[27]

LHB argues that the Taser mark's protection is a victim of genericide.  The proof, it contends, is two news articles and a Ninth Circuit opinion that use the word "Taser" without the trademark symbol.[28]  LHB contends that those articles and the opinion use the term "Taser" to refer broadly to any CEW rather than the Axon-branded version of the weapon, establishing that the Taser mark is generic in the minds of most consumers.[29]  Axon argues that this evidence is "wholly insufficient" to "carry [LHB's] heavy burden of establishing genericness."[30]  It notes that, though the opinion and one of the news articles used "Taser" without indicating that it is a

---

[23] *Elliot v. Google*, 860 F.3d 1151, 1155–56 (9th Cir. 2017) (quoting *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 905 (9th Cir. 2007)).

[24] *See Bayer Co. v. United Drug Co.*, 272 F. 505, 510 (S.D.N.Y. 1921); *DuPont Cellophane Co. v. Waxed Prods. Co.*, 85 F.2d 75, 82 (2d Cir. 1936); *Freecycle Network, Inc.*, 505 F.3d at 905.

[25] *Elliott*, 860 F.3d at 1156 (cleaned up) (quoting *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118 (1938)).

[26] *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 604 (9th Cir. 2005).

[27] *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005).

[28] ECF No. 59 at 9–10.

[29] *Id.* at 10.

[30] ECF No. 65 at 3.

1 trademark, they were nevertheless discussing events in which an Axon-branded weapon

2 (specifically the Taser X-26 CEW) was used.[31]  And the other article identified "Phazzer"—

3 another brand's CEW—as a "taser alternative," recognizing that Taser acts as a source-

4 identifying mark.[32]

5   LHB's evidence falls far short of establishing that the Taser name has become generic

6 and lost its legal protections.  The mere fact that two article authors and a Ninth Circuit panel

7 utilized the mark without a corresponding trademark symbol does not show as a matter of law

8 that the primary significance of "Taser" to consumers is as a type of good rather than a source

9 identifier.  And the context of each reference was to refer to an Axon product or to distinguish

10 other products as alternatives to Axon's weapons.

11   But even if I did find that LHB's evidence used Axon's mark generically, two articles

12 and a three-judge opinion are insufficient to overcome the strong presumption of validity given

13 to all registered marks.[33]  The Ninth Circuit has recognized that "[t]he mere fact that the public

14 sometimes uses a trademark" in a generic manner "does not immediately render the mark

15 generic."[34]  Indeed, even Kleenex™, Band-Aid™, and Xerox™ have long held onto their

16 protections despite ubiquitous public misuse.[35]  At most, LHB has shown that a small handful of

---

[31] *Id.* at 4.

[32] *Id.*

[33] *KP Permanent*, 408 F.3d at 604.  Courts that have found genericide established on summary judgment have done so based on records that were far more developed and relevant than that here.  *See, e.g., Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co*., 601 F.2d 1011, 1017 (9th Cir. 1979) (examining 45 exhibits including letters from government agencies, medical schools, medical facilities, and insurance organizations; a news article; six medical publications; and a physician's book to determine that "surgicenter" was generic).

[34] *Elliott*, 860 F.3d at 1156 (citing 15 U.S.C. § 1064(3)).

[35] *See generally*, Neal A. Hoopes, *Reclaiming the Primary Significance Test: Dictionaries, Corpus Linguistics, and Trademark Genericide*, 54 Tulsa L. Rev. 407 (Spr. 2019).

people used the Taser name without attaching the trademark symbol.  Because a jury could not reasonably infer from this thin and insignificant evidence that the primary significance of "Taser" in the mind of the general public refers to CEWs broadly and not Axon's Taser-branded weapons, I grant summary judgment in favor of Axon on LHB's genericide defense.

**B.      Genuine disputes remain over the likelihood of consumer confusion.**

In a typical trademark-infringement case, a defendant causes consumer confusion by using the plaintiff's mark, or one similar to the plaintiff's mark, to describe the defendant's own product.[36]  In such a case, the court applies the test from *AMF Inc. v. Sleekcraft Boats* to determine the likelihood that consumers would be confused by the defendant's mark use.[37]  The *Sleekcraft* test mainly focuses on the strength and similarity of the marks and the market overlap between the parties.[38]

But when a defendant instead uses a plaintiff's trademark to truthfully describe the plaintiff's product, the mark-holder's rights must be limited because "useful social and commercial discourse would be all but impossible if speakers were under threat of an infringement lawsuit every time they made reference to a . . . product by using its trademark."[39] This is referred to as "nominative use" of the mark.  Because the concern in a nominative-use case is "avoiding confusion over whether the speaker is endorsed or sponsored by the trademark holder," the *Sleekcraft* test is replaced by one developed in *Toyota Motor Sales v. Tabari* "as the

---

[36] *See e.g.*, *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118 (9th Cir. 2014) (analyzing likelihood of consumer confusion between the plaintiff's "POM" mark and the defendant's use of "pom" on its own products"); *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135 (9th Cir. 2002) (determining consumer confusion between the plaintiff's "Entrepreneur" mark and the defendant's "Entrepreneur Illustrated" mark).

[37] *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979).

[38] *See id.*

[39] *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 307 (9th Cir. 1992).

proper measure of consumer confusion."[40]  The *Toyota* test asks whether "(1) the product was 'readily identifiable' without use of the mark; (2) defendant used more of the mark than necessary; or (3) defendant falsely suggested [it] was sponsored or endorsed by the trademark holder."[41]  When a defendant asserts a nominative-fair-use defense, the "burden then reverts to the plaintiff to show a likelihood of confusion" under the *Toyota* test.[42]

All parties agree that LHB's use of Axon's marks is nominative—LHB is using "Taser" to describe genuine Axon products.[43]  But they disagree over (1) whether LHB's nominative use is fair and (2) whether Axon can meet its burden to prove consumer confusion under the *Toyota* test.  LHB argues that its use is fair because, without including Axon's stylized mark and logo, consumers would be unable to distinguish LHB's refurbished CEWs from those of other brands.[44]  It contends that this is because "Taser" has become generic, so using only the plaintext mark would not specify what goods it is selling.[45]  And LHB avers that it does nothing to suggest affiliation or sponsorship because it fully discloses that it's selling refurbished Tasers.[46]  Axon, on the other hand, argues that LHB fails all three elements of the nominative-fair-use test because the weapons are readily identifiable as Tasers without the use of Axon's stylized mark

---

[40] *Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071 (9th Cir. 2015); *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171 (9th Cir. 2010).

[41] *Toyota*, 610 F.3d at 1175–76.

[42] *Id.* at 1183.

[43] *See id.* at 1175 (holding that nominative use is present "where a defendant uses the mark to refer to the trademarked good itself").

[44] ECF No. 64 at 11.

[45] *Id.* at 12–13.

[46] *Id.* at 14–17.

and logo; "Taser" is not generic, so LHB is only permitted to use the plaintext mark; and LHB compounded confusion by suggesting affiliation through its advertising statements.[47]

### 1. *The product is not readily identifiable without the use of the Taser mark.*

The first prong of the *Toyota* test asks whether the goods at issue could be readily identified without use of the trademark by using "a descriptive substitute,"[48] or if use of the mark is "necessary to describe [LHB's] business."[49]  This element traditionally deals with the necessity of a word mark in describing a product,[50] so I focus only on whether Axon's "Taser" word mark was necessary to describe LHB's business.  LHB argues that no descriptive substitute exists for Tasers because, without Axon's mark, consumers would be unable to determine that it sells Axon's Taser-branded products rather than CEWs manufactured by other companies.[51]

In *Playboy Enterprises, Inc. v. Welles*, the Ninth Circuit analyzed a former Playboy magazine model's right to nominatively use the word marks "Playboy" and "Playmate of the Year" to describe herself.[52]  The panel held that the district court properly identified the situation as one in which no descriptive substitute exists because the defendant couldn't "identify or describe herself and her services without venturing into absurd descriptive phrases."[53]  While she could advertise herself as the "nude model selected by Mr. Hefner's magazine as its number one

---

[47] ECF No. 61 at 15–17.

[48] *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 802 (9th Cir. 2002).

[49] *Toyota*, 610 F.3d at 1180.

[50] *See, e.g., id.* at 1181; *Playboy Enters.*, 279 F.3d at 800; *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1153 (9th Cir. 2002).

[51] ECF No. 64 at 10–11.

[52] *Playboy Enters.*, 279 F.3d at 800.

[53] *Id.* at 802.

1  prototypical woman for the year 1981," doing so would be "impractical as well as ineffectual."[54]

2  So the significance of the defendant's services would not be readily identifiable without use of

3  the magazine's trademark.

4         "Taser" is Axon's trademarked brand name for its line of CEWs, and it's only the Taser-

5  branded version of these weapons that LHB refurbishes.[55]  A descriptive substitute for the

6  trademark could be "conducted-energy weapons manufactured by Axon Enterprise, Inc."  But,

7  like the *Playboy* substitutes, such a lengthier and less-efficient descriptive phrase would be

8  "impractical as well as ineffectual" compared to just saying "Taser."[56]  So I find that the first

9  *Toyota* prong favors LHB because its products are not readily identifiable without use of the

10  Taser mark.[57]

11

12         **2.**      ***LHB used more marks than reasonably necessary to identify that it was selling refurbished Tasers.***

13         LHB's primary argument for the second prong of the nominative-fair-use test hinges on

14  its genericide challenge.  It contends that it needed to use Axon's stylized marks and logos

15  because consumers would not know that Axon was the manufacturer of the refurbished goods if

16

17

---

18  [54] *Id.* at 802.  The *Playboy* court also cited the basketball-team name "Chicago Bulls" as an example of a mark without a descriptive substitute because saying "two-time world champions" or "the professional basketball team from Chicago" would be more complicated and harder to

19  understand than simply saying "Chicago Bulls."  *Id.*

20  [55] ECF No. 1 at 3.

   [56] *Playboy Enters.*, 279 F.3d at 802.

21  [57] To the extent that Axon argues that LHB's products are readily identifiable without using Axon's stylized marks and logo, I reserve that analysis for the second *Toyota* element because it

22  better assesses whether a defendant used more than was reasonably necessary to identify its products.  *See Toyota*, 610 F.3d at 1181–82 (analyzing the defendant's use of the plaintiff's word

23  mark in a domain name under the first element and then the stylized mark and logo under the second and third elements).

1  only the plaintext "Taser" descriptor was used.[58]  But the failure of this defense, as described

2  *supra*, dooms this theory, too.  So I assess whether the record contains any factual dispute as to

3  whether LHB used no more of Axon's marks than was "reasonably necessary to identify the

4  product." [59]

5          The Ninth Circuit has consistently expressed that nominative use of a plaintext mark

6  creates a lower risk of consumer confusion than using a trademark owner's stylized marks or

7  logos.[60]  For instance, in the foundational case *Volkswagen v. Church*, an automobile-repair

8  business specializing in Volkswagen vehicles used the Volkswagen and VW word marks on its

9  advertising materials.[61]  The court held that the repair shop's use was lawful because it "did not

10 use Volkswagen's distinctive lettering style or color scheme, nor . . . display[ed] the encircled

11 'VW' emblem."[62]  Later, in the *Toyota* case that produced the test we're now applying, the Ninth

12 Circuit suggested that the use of stylized marks creates a strong risk of consumer confusion.[63]

13

---

14 [58] ECF No. 64 at 11.

15 [59] *New Kids on the Block*, 971 F.2d at 308.

16 [60] *Playboy Enters.*, 279 F.3d at 802 (holding that former Playboy model could fairly use
   "Playboy" and "Playmate of the Year 1981" marks on her website because she used only "the
   trademarked words, not the font or symbols associated with the trademarks."); *New Kids on the
17 Block*, 971 F.2d at 304 (holding that two newspapers did not use the trademarked name of the
   pop group New Kids on the Block excessively because they didn't "use the New Kids'
18 distinctive logo or anything else that isn't needed to make the announcements intelligible to
   readers"); *Cairns*, 292 F.3d at 1144 (holding that the Franklin Mint was not unreasonable in its
19 use of Princess Diana's name and likeness with its commemorative dolls because it didn't use
   "any distinctive lettering or any particular image of Princess Diana intimately associated with"
20 the princess's estate); *but see Toho Co. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1209,
   1211 (C.D. Cal. 1998) (holding that a publisher who used the "Godzilla" trademark as the title of
21 a book used more of the mark than was reasonably necessary because the title was written in the
   plaintiff's trademarked lettering and style).

22 [61] *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 351 (9th Cir. 1969).

23 [62] *Id.* at 352.

   [63] *See Toyota*, 610 F.3d at 1174–75.

Toyota had sued two auto brokers over their use of its stylized Lexus mark and Lexus "L" logo on the brokers' website.[64]  The Ninth Circuit held that this use was more than what was reasonably necessary to identify the services because the use of the plaintiff's stylized mark and logo "might lead some consumers to believe they were dealing with an authorized Toyota affiliate."[65]  The court added that "imagery, logos[,] and other visual markers may be particularly significant in cyberspace, where anyone can convincingly recreate the look and feel of a luxury brand at minimal expense."[66]

Here, the record shows that LHB did not just use the word "Taser"; its website features Axon's stylized font and globe logo several times, increasing the risk that some consumers would believe that they were buying from an authorized Axon affiliate.[67]  And the fact that LHB is using these marks online enhances the risk of confusion because of the ease of misleading consumers in cyberspace that the *Toyota* court pointed out.[68]  So both the record and Ninth Circuit authority compel the finding that LHB's use of Axon's stylized mark and logo exceeds what was reasonably necessary to identify LHB's goods.  The second prong thus favors Axon.

### 3.  *Genuine issues of fact remain as to whether LHB suggested Axon's sponsorship or endorsement.*

The third *Toyota* prong asks whether the "defendant falsely suggested [it] was sponsored or endorsed by the trademark holder."[69]  While "[t]his element does not require that the

---

[64] *Id.*

[65] *Id.* at 1181.

[66] *Id.*

[67] ECF No. 61 at 7; ECF No. 61-17 (screenshots of accreditedsecurity.com).

[68] *Toyota*, 610 F.3d at 1181.

[69] *Id.* at 1175–76.

defendant make an affirmative statement that [its] product is not sponsored by the plaintiff,"[70] "such a disclaimer is relevant to the nominative-fair-use analysis."[71]  LHB argues that it is entitled to summary judgment on this claim because, under the first-sale doctrine established by the Supreme Court in *Champion Sparkplug Company v. Sanders*, LHB avoided consumer confusion by fully disclosing that its products are refurbished and by maintaining the basic nature of the Taser through the refurbishment process.[72]  Axon responds that the first-sale doctrine isn't dispositive of this prong because affiliation confusion can still exist for disclosed refurbished products.[73]  Axon adds that it has met its burden on this prong with evidence of actual confusion, the advertising statements and proximity of the parties' marks suggests affiliation, and LHB's disclaimers are ineffective to purge the risk of confusion.[74]

### a.   The first-sale doctrine

I begin with the first-sale doctrine because success on that affirmative defense is dispositive in the likelihood-of-confusion analysis.[75]  This doctrine is shaped primarily by the Supreme Court's rulings in *Champion Sparkplug* and *Prestonettes, Inc. v. Coty*.[76]  In *Champion Sparkplug*, a sparkplug-reconditioning company was sued for trademark infringement by the manufacturer Champion for using the Champion mark on the repaired plugs and their packaging.[77]  The court held that secondhand dealers are entitled to some benefit from a

---

[70] *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 811 (9th Cir. 2003).

[71] *Toyota*, 610 F.3d at 1182 (cleaned up).

[72] ECF No. 59 at 10–16; *Champion Sparkplug Co. v. Sanders*, 331 U.S. 125 (1947).

[73] ECF No. 65 at 5.

[74] ECF No. 61 at 17–19.

[75] *See Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074–75 (9th Cir. 1995).

[76] ECF No. 64 at 7.

[77] *Champion Sparkplug*, 331 U.S. at 126.

manufacturer's trademark and found that the reconditioning company's use of Champion's word and style marks on the repaired plugs was not infringement.[78]

In *Prestonettes*, a beauty-products reseller sold rebottled perfumes using the producer's registered trademarks on the bottles and was sued for trademark infringement.[79]  The Supreme Court held that a mark holder does not have the right "to prohibit the defendant from making even collateral reference to the plaintiff's mark" when the defendant is reselling a genuine article associated with the mark.[80]  That rule was later formalized as the first-sale doctrine, and the Ninth Circuit adopted it in *Sebastian International v. Longs Drug Stores*, noting that the doctrine "is not rendered inapplicable merely because consumers erroneously believe the reseller is affiliated with or authorized by the producer."[81]  The *Sebastian* court thus held that, "[w]hen a purchaser resells a trademarked article under the producer's trademark, and nothing more, there is no actionable misrepresentation."[82]

Though LHB relies on *Champion* and *Prestonettes*, it reads these cases too broadly.  Both concern the use of a producer's trademark on a resold article and its immediate packaging, but they say nothing about the use of a producer's stylized marks and logo on advertising materials.  Axon's trademark claims are not based on LHB's use of its marks on the refurbished Tasers or their packaging like in *Champion*.  Nor does Axon seek to enjoin LHB's sale of Tasers, as was the case with the perfume reseller in *Prestonettes*.  So the first-sale doctrine is a poor fit here and does not shield LHB from liability for its use of Axon's marks.

---

[78] *Id.* at 127.

[79] *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 366–67 (1924).

[80] *Id.* at 369.

[81] *Sebastian Int'l*, 53 F.3d at 1076.

[82] *Id.*

15

**b.     *Axon's actual-confusion evidence***

Axon seeks to show actual consumer confusion by submitting three emails from various police officers and personnel inquiring about any affiliation between Axon and LHB, as well as declarations from Officer Michael Cinardo and Detective Timothy Prouty that they were confused about an affiliation between the parties.[83]  LHB criticizes the quantity and quality of Axon's evidence, arguing that, because LHB markets to thousands of police departments, a mere two declarations are insufficient to prove confusion.[84]  It adds that these declarations are hearsay, so Federal Rule of Civil Procedure 56 precludes their use on summary judgment.[85]  LHB also contends that this evidence doesn't go far enough as Cinardo's declaration only states that he was under the belief that LHB "could be affiliated with Axon,"[86] not that he believed that it was affiliated, and that Prouty's declaration is not relevant because the advertising materials LHB sent to his police department were addressed not to him but to the police chief.[87]

LHB's evidentiary argument misapplies Rule 56, which allows declarations to be considered on summary judgment so long as they are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."[88]  Both of these declarations are made on personal knowledge: the declarants attest to their own confusion and actions they took in response.  And LHB does not otherwise

---

[83] ECF No. 61-10 (emails); ECF No. 61-11 (Cinardo declaration); ECF No. 61-12 (Prouty declaration).

[84] ECF No. 66 at 9–11.

[85] *Id.* at 10–11.

[86] ECF No. 61-11 at 2.

[87] ECF No. 66 at 10.

[88] Fed. R. Civ. P. 56(c)(4).

1 show that the declarations, or any part of them, suggest that these witnesses' in-court testimony

2 would be hearsay.

3       LHB's semantic criticism of Cinardo's less-than absolute wording falls flat because, as

4 phrased, the statements still create a genuine issue of fact.  And LHB's argument regarding the

5 relevance of Prouty's declaration is a credibility determination for the jury.  While this evidence

6 of actual confusion is not deep, the Ninth Circuit has acknowledged that "[e]vidence of actual

7 confusion is strong evidence that future confusion is likely[,]" though a reasonable juror may

8 "find *de minimis* evidence of actual confusion unpersuasive as to the ultimate issue of likelihood

9 of confusion."[89]  I cannot conclude that a jury couldn't find this evidence sufficient.

10           **c.**     ***Context of LHB's mark use***

11       Axon argues that LHB's advertising claims actively suggest that LHB has Axon's

12 endorsement.  It points to LHB's phrases such as "100% certified to work like new," false

13 description of itself as "an [a]uthorized TASER® distributor," its use Axon's stylized mark in

14 the top left corner of every single page on accreditedsecurity.com, and its incorporation of

15 Axon's globe/bolt logo into that same page.[90]  Axon also contends that LHB's disclaimers are

16 ineffective at curing confusion because of their placement alone—they appear in small font at the

17 bottom of LHB's website and are thus "buried and easy to miss."[91]  It relies primarily on the

18 Ninth Circuit case *TrafficSchool.com, Inc. v. Edriver Inc.* for this placement proposition.[92]

19

20 ───────────────

[89] *Entrepreneur Media*, 279 F.3d at 1150.

21 [90] ECF No. 61 at 17–18.

[91] *Id.* at 18–19.

22 [92] ECF No. 61 at 18–19; *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 828 (9th Cir.

23 2011).  Axon also cites various unpublished and published cases from federal district courts in California: *Macy's Inc. v. Strategic Marks, LLC*, 2016 WL 374147, *8 (N.D. Cal. Feb. 1, 2016); *Toho Co., Ltd*, 33 F. Supp. 2d 1206, 1212 (C.D. Cal. 1998); *Oracle Corp. v. Light Reading, Inc.*,

*TrafficSchool.com* concerned a district court's injunction requiring the defendant to present a "splash screen" disclaimer of affiliation on its website.[93]  The defendants argued that alternative disclaimers were more effective than the splash screen, but the Ninth Circuit panel concluded that they had failed to carry their burden of proving that the district-court-ordered disclaimer was ineffective.[94]  Importantly, however, the court did not hold that disclaimers of the type LHB employed were ineffective as a matter of law, so *TrafficSchool.com* fails to support Axon's point.

Whether LHB suggested affiliation with Axon requires the court to balance the confusion risk of LHB's advertising conduct against the efficacy of its refurbishment disclosure and non-affiliation disclaimers.  This exercise reveals genuine issues of fact.  A jury could read LHB's claim that is products are "100% certified to work like new" as indicating that the Tasers were certified by Axon or an independent third party.  And reasonable minds could differ on whether LHB's disclaimers cured any confusion arising from its use of Axon's marks on its websites.  Indeed, "the question of likelihood of confusion is routinely submitted for jury determination as a question of fact,"[95] and nothing in this record suggests that this case should be different.

### 4.  *Axon's trademark-infringement claim proceeds to trial.*

In sum, the first *Toyota* prong favors LHB because its products are not readily identifiable without some use of Axon's marks.  But Axon prevails on the second *Toyota* prong because it has shown that LHB uses more of Axon's marks than was reasonably necessary.  With

---

233 F. Supp. 2d 1228, 1232 (N.D. Cal. 2002).  But those decisions are too fact-based to be persuasive here.

[93] *TrafficSchool.com*, 653 F.3d at 824.

[94] *Id.* at 829.

[95] *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356 n.5 (9th Cir. 1985).

outstanding factual disputes on the third prong—whether LHB did anything to suggest affiliation or sponsorship by Axon—I am left with a likelihood-of-confusion tie that must be broken by a jury.  The Ninth Circuit has made clear that "summary judgment is generally disfavored in the trademark arena" precisely because of the "intensely factual nature of trademark disputes."[96] Because this case presents that typical posture, I deny the parties' summary-judgment cross-motions on Axon's trademark-infringement and false-designation-of-origin claims, though I grant summary judgment on LHB's genericide defense.

### III. Genuine factual disputes as to the falsity of several of LHB's advertising statements compels the denial of summary judgment on Axon's false-advertising claim.

A Lanham Act false-advertising claim has five elements: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products."[97]  "To demonstrate falsity . . . a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers."[98]

---

[96] *Interstellar Starship*, 184 F.3d at 1109.

[97] *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (quoting *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv., Inc.*, 911 F.2d 242, 244 (9th Cir. 1990)).

[98] *Id.* (quoting *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943, 946 (3rd Cir. 1993)).

Axon's false-advertising claim targets three categories of LHB's advertising statements, which I sort into three groups that I'll label product-superiority, refurbishment-quality, and affiliation statements.  LHB's product-superiority statements include claims that the Taser X26E model "wield[s] the highest degree of takedown power of total and absolutely unsurpassed effectiveness[;]" "offers the highest degree of takedown power ever available with the same level of safety[;]" "has the most powerful technology and stopping force[;] "lasts for over 20 years—and works every time[;]" and has "twice the power" as the X26P CEW.[99]  LHB offers the refurbishment-quality statements that its products are "factory refurbished," "professionally refurbished," "thoroughly tested," "refurbished to the highest standard," "completely refurbished," "work like new," and reprogrammed "with the latest software."[100]  Finally, LHB makes the affiliation statements that it is an "[a]uthorized TASER® [d]istributor"  and "TASER® is a [t]rademark of the Mister Stungun."[101]

### A.    LHB's product-superiority statements do not support Axon's false-advertising claim.

LHB first attacks Axon's false-advertising claim based on its product-superiority statements with a puffery defense, arguing that its claims about the quality of the Taser X26E are general and exaggerated claims that "preclude reliance by consumers."[102]  The Ninth Circuit has recognized that "puffing immunizes an advertisement from liability under the Lanham Act."[103]  But a "specific and measurable advertisement claim of product superiority based on product

---

[99] ECF No. 64 at 21–24.

[100] ECF No. 65 at 9 –10; ECF No. 67 at 8.

[101] ECF No. 61-14 at 2; ECF No. 16-15.

[102] ECF No. 64 at 21 (quoting *Cook, Perkiss & Liege*, 911 F.2d at 246).

[103] *Cook*, 911 F.2d at 245.

testing is not puffery."[104]  So the ultimate "difference between a statement of fact and mere puffery rests in the specificity or generality of the claim" and whether the statement is quantifiable or subjective.[105]

LHB's product-superiority statements are specific and quantifiable.  They include claims that the Taser X26E "wield[s] the highest degree of takedown power of total and absolutely unsurpassed effectiveness[;]" (2) "offers the highest degree of takedown power ever available with the same level of safety[;]" (3) "has the most powerful technology and stopping force[;] (4) "lasts for over 20 years — and works every time[;]" and (5) has "twice the power" as the X26P CEW.[106]  Though LHB claims that these statements are mere puffery, I already noted in my order denying its motion to dismiss that they are not.[107]  The statements "are directed to Axon's [Taser] products, not stun guns in general, . . . and they are all specific factual claims, not generalized outrageous ones."[108]  Because each of these statements is quantifiable, measurable, and specific, they are not immunized from liability as mere puffery.

But they're also not false.  Axon's position is that LHB's statements about the superiority of the Taser X26E CEW are false because Wenger never tested that model against others.[109]  Indeed, Wenger admitted at deposition that he has no documents concerning tests, reports, or analysis that he has performed on refurbished Tasers; has not carried out any scientific, medical,

---

[104] *Southland Sod*, 108 F.3d at 1145.

[105] *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008) (citing *Cook*, 911 F.2d at 246).

[106] ECF No. 64 at 21–24.

[107] ECF No. 29 at 23 ("I find that the statements that Axon complains about at paragraph 39 of its complaint are not puffery.").

[108] *Id.*

[109] ECF No. 65 at 10–11.

or engineering studies on Taser devices;[110] has not commissioned any such studies;[111] and made statements about Taser takedown power, stopping power, effectiveness, and durability based on two media articles, his personal opinions, stories from his customers, and unspecified google searches.[112]  Axon relies on the Ninth Circuit's ruling in *Southland Sod Farms v. Stover Seed Company* that a plaintiff may meet its burden on a false-advertising claim by "attacking the validity of the defendant's tests directly."[113]

The *Southland Sod* case involved product-superiority statements grounded in testing.  In that case, a turfgrass seed and sod producer sued a competitor for its advertisements containing bar charts, data tables, photographs, and test results comparing the companies' products to support the assertion that the competitor's products grew faster.[114]  The *Southland Sod* panel adopted its rule from the Second Circuit's opinion in *Castrol, Inc. v. Quaker State Corporation*, which distinguished a "product[-]superiority claim not based on testing . . . from [a] product [-]superiority claim explicitly or implicitly based on tests or studies"[115] because the "plaintiff bears a different burden in proving literally false the advertised claim that tests prove defendant's product superior, than it does in proving the falsity of a superiority claim which makes no mention of tests":[116] a plaintiff who seeks to prove false a statement not referring to testing must offer affirmative evidence of falsity.[117]  The court's analysis thus focused on the defendant's

---

[110] ECF No. 61-1 at 21, ¶¶ 7–25.

[111] *Id.* at 22, ¶¶ 5–7.

[112] *Id.* at 23–28.

[113] *Southland Sod*, 108 F.3d at 1139.

[114] *Id.* at 1137.

[115] *Id.* (*citing Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62–63 (2d Cir. 1992)).

[116] *Quaker State*, 977 F.2d at 63.

[117] *Id.*

tests and allowed the plaintiff to meet its burden solely by challenging the validity of those tests.[118]

But LHB's product-superiority statements make no mention of testing—they are bald statements about the quality and capabilities of the Taser X26E.  So Axon must submit affirmative evidence of falsity to meet its burden, and the record is devoid of such evidence.  The closest Axon gets to evidence of falsity is its challenge to LHB's claim that the X26E Taser "lasts for over 20 years,"[119] refuted by its expert report stating that "Axon has established a 5-year useful life for its CEW products and strongly discourages . . . use of CEWs beyond their 5-year useful life."[120]  But a manufacturer's strong recommendation of a product's useful lifespan does not show that the device cannot last for more than 20 years.  I find that Axon has not met its burden to prove that any of LHB's product-superiority advertising statements violate the Lanham Act.  So, at trial, Axon cannot introduce LHB's product-superiority statements to prove its false-advertising claim.

### B.      LHB's refurbishment-quality claims

The second category of false statements Axon identifies is LHB's statements about the quality of its refurbished Tasers.  Axon contends that LHB's Tasers cannot be "factory refurbished" because the process takes place only in Wenger's home or in the homes of his independent contractors; nor "professionally refurbished" because Wenger has no degree or

---

[118] *Id.* at 1139.  The *Southland Sod* court also cited *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991).  In that case, the Second Circuit held that affirmative evidence of falsity is not necessary if the claim is "bottomed on the results of the [defendant's] studies"; in such a case, the plaintiff can "meet its burden of proof by demonstrating that these studies did not establish" the advertised claim.  *Id.* at 1549.

[119] ECF No. 64 at 23.

[120] ECF No. 62-3 at 5 (Chiles expert declaration).

expertise in mechanical engineering; nor "thoroughly tested" because LHB does not run independent testing other than superficial inspection; nor "refurbished to the highest standard" because LHB identified no standards it was using; nor "completely refurbished" to "work like new" because Tasers are sonically welded together such that their internal components cannot be examined or replaced.[121]   And finally, while Axon agrees that LHB's Tasers might be reprogrammed "with the latest software," it argues that such a claim is misleading because the last X26E firmware update was in 2014 and Wenger does not have access to the most recent updates for two of the other Taser models he sells.[122]

LHB responds that its statements regarding the quality of the refurbished Tasers are not false and that Axon's arguments to the contrary are based on its own five-year useful-life determination that in no way represents an industry or lawfully binding standard.[123]   Wenger declares that he "does indeed professionally refurbish [Tasers]" so that they "work[] like new,"[124] ensuring that each Taser "undergoes several aesthetic and functionality inspections" in which he "installs new batteries, new firmware, cleans any internal carbon build-up in the front cartridge, clears any error codes, and ensures each element of the [display] functions properly."[125]   And as to the "factory-refurbished" qualifier, Wenger declares that his products may be "considered 'factory refurbished'" because he maintains a "designated space [that] LHB references as a 'factory' area to perform the refurbishment process."[126]

---

[121] ECF No. 65 at 9–10; ECF No. 67 at 8.

[122] *Id.* at 10.

[123] ECF No. 66 at 13–18.

[124] ECF No. 59 at 17; ECF No. 60 at 21 (Wenger's deposition).

[125] ECF No. 59 at 17; ECF No. 60 at 43 (supplemental answer to Axon's interrogatories).

[126] ECF No. 64 at 19.

I find that LHB's refurbishment-quality promises have subjective meanings on which reasonable jurors could disagree.  While Wenger admits that his refurbishment process consists of just "minimal tweaks and repairs," and he "merely confirms [that] 'the CEW is functional . . . and clean[,]" these refurbishment representations are not literally false as a matter of law,[127] and a jury must determine how a reasonable consumer would interpret LHB's statements and whether they are misleading.  So I deny the parties' summary-judgment motions as to Axon's false-advertising claims based on LHB's refurbishment-quality statements.

### C.   LHB's affiliation statements

The final category of literally false statements Axon identifies is LHB's references that suggest its formal affiliation with, or endorsement by, Axon.  These include LHB's website statements that it is an "[a]uthorized TASER® [d]istributor"[128] and that "TASER® is a [t]rademark of the Mister Stungun."[129]  Both parties agree that neither is true,[130] and Axon has submitted a declaration from its counsel affirming that Axon is the sole mark-holder of the Taser trademark and that neither LHB nor Wenger is "licensed, authorized, sponsored, endorsed, or approved by Axon to sell or 'refurbish' its products or use its [Taser] [m]arks in any of its advertising."[131]  The record thus establishes without genuine dispute that these two statements are literally false.

---

[127] ECF No. 59 at 15; ECF No. 65 at 7.

[128] ECF No. 61-14 at 2 (screenshots of accreddited financialservices.com).

[129] ECF No. 61-15 (screenshots of misterstungun.com).

[130] ECF No. 66 at 16 ("It is undisputed that through the course of this litigation, [LHB] learned that some of [its] older websites have not been updated to reflect that LHB is a former authorized Taser distributor and/or dealer.").

[131] *Id.* at 11.

But to prevail on its false-advertising claim based on these affiliation statements, Axon must also show that they actually deceived or had the tendency to deceive a substantial segment of its audience, the deception was material, the advertising entered interstate commerce, and the plaintiff was injured.[132]  If a statement is literally false, there exists a presumption that the statement was material[133] and that consumers were actually deceived by it.[134]  Nothing in the record suggests that those presumptions should not apply here.  And the record shows that these statements were made on the internet, which is indisputably "an instrumentality and channel of interstate commerce."[135]

Axon seeks both a permanent injunction and compensatory damages, but it points to no evidence of actual injury or damages from LHB's false affiliation statements.  Though "an

---

[132] *Southland Sod*, 108 F.3d at 1139.

[133] *See U-Haul Intern., Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040–41 (9th Cir. 1986) (affirming that publication of "deliberately false comparative claims gives rise to a presumption of actual deception and reliance"); *Pizza Hit, Inc. v. Papa John's Intern., Inc.*, 227 F.3d 489, 497 (5th Cir. 2000) ("With respect to materiality, when the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers."); *ITEX Corp. v. Global Links Corp.*, 90 F. Supp. 3d 1158, 1172 (D. Nev. 2015) ("[I]f the statements at issue are found to be literally false, the court may presume materiality.").

[134] *See William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) (holding that the defendant's "failure to establish that a significant number of consumers were actually deceived [was] not necessarily fatal to its case" because the court may "presume consumers were in fact deceived" if evidence showed the plaintiff intentionally misled consumers); *see also Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 33 (1st Cir. 2000) ("If the advertisement is literally false, the court may grant relief without considering evidence of consumer reaction."); *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991) (If "the advertising claim is shown to be literally false, the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public.") (internal quotations omitted).

[135] *U.S. v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007).

inability to show actual damages does not alone preclude a recovery," [136] "[a] plaintiff must prove both the fact and the amount of damage."[137]  Axon has submitted no evidence of damages it suffered from any of LHB's conduct, so it has not shown—or even demonstrated a genuine dispute of fact—that compensatory damages are recoverable for these false statements.

But Axon prevails on its request for injunctive relief.  The Ninth Circuit held in *Harper House v. Thomas Nelson* that a plaintiff "need not prove injury when suing to enjoin conduct that violates" the Lanham Act.[138]  Because Axon has satisfied all other elements of its false-advertising claim based on LHB's affiliation statements, I grant its requested relief and enjoin LHB from claiming that it or any of its affiliates is an authorized Taser distributor or owns any of Axon's trademarks involved in this case.  Axon's false-advertising claim thus proceeds to trial only on LHB's refurbishing-quality statements.

## IV. The parties' cross-motions for summary judgment on Axon's deceptive-trade-practices claim are granted in part and denied in part.

Axon relies on the same three categories of false statements to assert a deceptive-trade-practices claim against LHB.  A party engages in deceptive trade practices under Nevada law if it "knowingly makes a false representation as to affiliation, connection, association with[,] or certification by another person[;]" represents that goods for sale are of a "particular standard, quality[,] or grade" if it "knows or should know that they are of another standard, quality, [or]

---

[136] *Southland Sod*, 108 F.3d at 1146 (citing *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1411 (9th Cir. 1993), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016)).

[137] *Lindy Pen Co., Inc.*, 982 F.2d at 1407.

[138] *Harper House, Inc.*, 889 F.2d at 210.

grade[;]" or disparages the goods or business of another person "by false or misleading representation of fact."[139]

### A. Axon prevails on its deceptive-trade-practices claim as to LHB's false affiliation statements.

As to LHB's false statements of affiliation, for the reasons I granted Axon summary-judgment on that portion of the false-advertising claim, Axon is similarly entitled to summary judgment on this claim. The record establishes that the parties ended their distributor relationship at some point well before Axon filed its lawsuit against LHB, and LHB admits that it was aware of this, thus satisfying the "knowingly" requirement under Nevada law.[140] Though it claims that it was not aware that one of its websites still displayed the representation that it is an authorized Taser distributor, the record shows that LHB was at least aware that its distributor relationship with Axon had ended while the statements at issue were displayed.[141] So I grant Axon's summary-judgment motion as to the affiliation-statement liability portion of its deceptive-trade-practices claim.

Axon seeks injunctive relief, treble damages, costs, and attorneys' fees on its deceptive-trade-practices claim.[142] Under Nevada's deceptive-trade-practices statute, the court may require a liable party "to pay to the aggrieved party damages on all profits derived from the knowing and willful engagement in a deceptive trade practice and treble damages on all damages suffered by

---

[139] Nev. Rev. Stat. § 598.0915(3), (7), (8).

[140] ECF No. 60 at 27 (Exhibit A; Wenger deposition) (stating "[w]e're not an authorized distributor anymore" and that, regarding the representation on one of LHB's websites that it is, "[w]e will need to remove it. I don't know if it still appears. But if it does, we will remove it.").

[141] ECF No. 64-2 at 75–76 (Wenger stating that LHB's partnership with Axon ended "some 20 years ago").

[142] ECF No. 1 at 20.

reason of" that practice.[143]  And Nevada's consumer-fraud statute requires a court to award a deceptive-trade-practices claimant "any damages that the claimant has sustained; any equitable relief that the court deems appropriate; and the claimant's costs in the action and reasonable attorney's fees."[144]  Axon thus may recover damages and attorney's fees for these deceptive trade practices.  But, because it submits no evidence as to either, it will need to prove the amount of those damages and costs at trial or during subsequent motion practice, as appropriate.  Finally, as to the injunctive relief that Axon requests, it is identical to the injunction that I granted for the affiliation-statements portion of its false-advertising claim, *supra*, so I need not grant any further relief.

**B.    The remainder of Axon's deceptive-trade-practices claim proceeds to trial.**

But genuine disputes of fact remain as to whether LHB's use of Axon's marks, its representations about the quality of its goods, or its allegedly disparaging remarks about other Axon models were deceptive under Nevada law.  As discussed in the trademark-infringement analysis *supra*, whether LHB's use of Axon's stylized mark and logos suggests a false affiliation or connection with Axon is a question of disputed fact that cannot be resolved on summary judgment.  As for LHB's quality-of-goods representations, Axon argues that LHB's "professionally refurbished," "highest standard," and "like new" statements are deceptive.[145]  But, as explained in my Lanham Act analysis, these statements have subjective meanings and are not false based on the record.[146]  So I find that whether there was any misrepresentation as to the quality of LHB's refurbishment presents a material factual dispute that must be resolved by a

---

[143] Nev. Rev. Stat. § 598.0999(3).

[144] Nev. Rev. Stat § 41.600 (cleaned up).

[145] ECF No. 61 at 27.

[146] *See supra* p. 25.

jury.  And I hold the same for LHB's product-superiority statements that Axon contends

qualifies as disparagement under state law because LHB submits no evidence indicating that

those statements are false.  Though the record is devoid of such evidence of falsity, Nevada law

imposes liability for disparaging claims based on true-but-misleading statements.[147]  And

whether consumers were misled by LHB's product-superiority statements cannot be determined

on this record.[148]  So the remainder of Axon's deceptive-trade-practices claim proceeds to trial

on the logo-and-mark-use, quality-of-goods, and product-superiority/disparagement statements.

**V.      Thin but genuine disputes of fact preclude summary judgment on Axon's cybersquatting claims.**

Axon alleges that LHB violated the Anti-Cybersquatting Consumer Protection Act

(ACPA) by registering and offering for sale 64 domain names that incorporate marks that are

identical or confusingly similar to Axon's.[149]  To support its claim, Axon offers a screenshot of

one of LHB's websites listing its various Taser-related domains with a headline banner labeled

"Domain Names for Sale."[150]

ACPA claims require evidence that "(1) the defendant registered, trafficked in, or used a

domain name; (2) the domain name is identical or confusingly similar to a protected mark owned

by the plaintiff; and (3) the defendant acted 'with a bad faith intent to profit from that mark.'"[151]

Thus a "finding of 'bad faith' is an essential prerequisite to finding an ACPA violation."[152]

---

[147] *See* Nev. Rev. Stat. § 598.0915.

[148] ECF No. 59 at 24; ECF No. 65 at 12–13.

[149] ECF No. 1 at 15, 18.

[150] ECF No. 61-19.

[151] *DSPT Intern., Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010) (quoting 15 U.S.C. § 1125(d)(1)(A)).

[152] *Interstellar Starship*, 304 F.3d at 946.

1   "Congress has enumerated nine nonexclusive factors for courts to consider in determining

2   whether bad faith exists[:]"[153] (1) the trademark rights of a party in the domain name; (2)

3   whether the domain name consists of a person's legal or commonly-used name; (3) the

4   defendant's "prior use, if any, of the domain name in connection with the bona fide offering of

5   any goods or services;" (4) the defendant's "bona fide noncommercial or fair use of the mark in a

6   site accessible under the domain name;" (5) the defendant's "intent to divert consumers from the

7   mark owner's online location to a site accessible under the domain name that could harm the

8   [mark's] goodwill;" (6) the defendant's "offer to transfer, sell, or otherwise assign the domain

9   name to the mark owner or any third party for financial gain without having used . . . the domain

10  name in the bona fide offering of any goods or services;" (7) the "provision of misleading false

11  contact information when applying for the" domain-name registration; (8) the defendant's

12  "registration or acquisition of multiple domain names" that are "identical or confusingly similar

13  to the marks of others that are distinctive at the time of registration of such domain names;" and

14  (9) "the extent to which the mark incorporated in the . . . domain[-]name registration is or is not

15  distinctive and famous."[154]   The most important grounds for finding bad faith are the unique

16  circumstances of the case.[155]

17          **A.      Bad faith can arise any time after a domain name is registered.**

18          The parties disagree over the correct standard for when evidence of bad faith may arise

19  under the ACPA.  Axon contends that "[e]vidence of bad faith may arise well after registration

20  of the domain name[,]" quoting the Ninth Circuit's opinion in *DSPT International, Inc. v.*

21

22  _____

    [153] *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009); 15 U.S.C. § 1125(d)(1)(B)(i).

23  [154] 15 U.S.C. § 1125(d)(1)(B)(i).

    [155] *Interstellar Starship*, 304 F.3d at 946.

*Nahum*.[156]  LHB offers the Ninth Circuit's holding in *GoPets Limited v. Hise* that bad faith must be evident at the time of domain registration.[157]  But a closer look at these cases makes clear that the ACPA has no such timeframe restriction.

In *DSPT International*, the Ninth Circuit panel held that bad-faith evidence can arise after domain registration—a principle established by its prior holding in *Lahoti v. VeriCheck, Inc.*[158] The *Lahoti* court reached its conclusion by accepting the reasoning in a Second Circuit case that held that "Congress intended the [ACPA] to make rights to a domain-name registration contingent on ongoing conduct rather than to make them fixed at the time of registration."[159] These holdings are consistent with the statute's plain language.[160]  The ACPA doesn't mention registration anywhere in its bad-faith requirement,[161] and it references "at the time of registration" only in discussing when an infringed mark must be distinctive or famous to bring an ACPA claim.[162]

By contrast, the *GoPets* panel stated without analysis that cybersquatting claimants under the ACPA must show "'bad faith intent' at the time of registration[,]" citing only the statute as authority for that rule.[163]  While *GoPets* postdates *DSPT International* by a year, it makes no

---

[156] ECF No. 61 at 20 (quoting *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1219 (9th Cir. 2010)).

[157] ECF No. 59 at 22 (citing *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1030 (9th Cir. 2011)).

[158] *DSPT Int'l*, 624 F.3d at 1220 (citing *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009)).

[159] *Lahoti*, 586 F.3d at 1202 (quoting *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 385 (2d Cir. 2003)).

[160] *See* 15 U.S.C. § 1125(d)(1)(A)(i), (B).

[161] *Id.* at § 1125(d)(1)(A)(i) (stating that a person is liable if he "has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section").

[162] *Id.* at § 1125(d)(1)(A)(ii)(I).

[163] *GoPets Ltd.*, 657 F.3d at 1030.

mention of either *DSPT International* or *Lahoti*'s clearly conflicting standard.  Rather, its holding focuses on the separate issue of whether domain re-registrations qualify as registrations under the act.[164]  It appears, therefore, that the language LHB relies on is mere dicta.  So I find that this court need not confine its search for bad-faith evidence only to the moment of the domain registration, and I evaluate the entire record of such evidence in light of the Ninth Circuit's nine-factor analysis.

**B.     There are genuine disputes over whether LHB acted in bad faith.**

No party contests the first factor (that Axon owns the Taser trademark), the eighth factor (that there are multiple registrations that contain Axon's whole mark or similar marks), or the ninth factor (that the allegedly infringed mark was famous or distinctive when the domains were registered).  And both parties agree that the second and seventh factors are not relevant in this case.[165]  The core of the dispute is thus the third through sixth factors.  And though the record favors Axon, I also find that LHB raises genuine questions of fact as to these factors that prevent me from finding bad faith as a matter of law.

*1.     Prior use and offers to sell domains*

The third bad-faith factor assesses the defendant's "prior use, if any, of the domain name in connection with the bona fide offering of any goods or services."[166]  The record reflects that LHB was an authorized distributor for Axon at the time that it registered at least some of the

---

[164] *Id.*

[165] The second factor concerns domain names using marks consisting of a person's legal name and the seventh factor involves the registrant's provision of material or misleading contact information.  15 U.S.C. § 1125(d)(B)(i)(II), (VII).

[166] *Id.* at § 1125(d)(B)(i)(III).

contested domains[167] and that LHB is a reseller of refurbished Axon CEWs.[168]  LHB argues that its previous use of the domains as an authorized distributor that offered—and continues to offer—genuine Axon goods shows that it was not acting in bad faith, at least at the time of registration.[169]  Axon responds that LHB's continued use of the domains after the distributor relationship ended and its later offers to sell the domains to Axon constitute "the precise behavior the cybersquatting statute seeks to prevent."[170]  But this factor asks only whether LHB's prior use of the domain name was in connection with the bona fide offering of goods, and the record shows that it was.  The genuine dispute arises from how this factor balances against the others in determining bad faith in LHB's current and ongoing conduct.

This same reasoning applies to the sixth factor, which analyzes whether LHB has offered to sell the domains to Axon "or any third party for financial gain without having used . . . the domain name in the bona fide offering of any goods."[171]  Though LHB claims that it never auctioned off any domains and that, whenever Axon "requested the domain names in the past, LHB has offered them," the sixth factor does not require actual sale of the domains—just the mere offer to transfer or sell the domain name for financial gain[172]—and the record shows that, until recently, LHB's usedtaserforsale.com domain had a banner above a list of the contested

---

[167] Axon also notes that some of the allegedly infringing domains must have been registered after the parties' distributorship agreement ended in 1995 because several domains contain model names of CEWs that were released in 2003 and 2007.  ECF No. 67 at 10 n.9.

[168] ECF No. 64-2 at 21 (Wenger deposition); ECF No. 59 at 2–4.

[169] ECF No. 66 at 16.

[170] ECF No. 67 at 11.

[171] 15 U.S.C. § 1125(d)(B)(i)(VI).

[172] ECF No. 59 at 23.

domains reading: "Domain Names for Sale."[173]  But an issue of fact arises from the latter half of the sixth factor, which recognizes that such offers are made in bad faith if the domains are not used in the bona fide offering of goods.  And because LHB sells refurbished Axon CEWs, there is a question of fact whether LHB's prior and current bona fide sales of Tasers would prevent a finding of bad faith on this factor.

### 2.    *Noncommercial use*

The fourth factor asks if LHB had a "bona fide noncommercial or fair use of the mark in a site accessible under the domain name."[174]  LHB makes an argument for noncommercial use on only one of the contested domains, contending that LHB does not seek to profit from Axon's mark because its tasers.org domain is "simply a webpage that lists the dictionary definition [of Taser] and provides links to clearly marked refurbished [Taser] products and to new [Taser] products through [Axon's] own website."[175]  To what degree including links to both parties' sales websites on a domain page renders it noncommercial is a question of fact for the jury.

### 3.    *Intent to divert or tarnish*

The fifth factor analyzes LHB's "intent to divert consumers" to its own websites "that could harm the [mark's] goodwill . . . either for commercial gain or with the intent to tarnish or disparage the mark."[176]  Axon primarily argues that the redirection of four of the contested domains to websites containing pornography constitutes tarnishment.[177]  LHB offers no response.  But I do not find that this factor establishes bad faith as a matter of law because the

---

[173] ECF No. 61-19.

[174] 15 U.S.C. § 1125(d)(B)(i)(IV).

[175] ECF No. 59 at 22.

[176] 15 U.S.C. § 1125(d)(B)(i)(V).

[177] ECF No. 61 at 21.

record does not sufficiently show that LHB had intent to tarnish the Taser mark or that it benefitted financially from the redirection of some of its domains to websites containing pornography.

Because genuine disputes over the third through sixth factors prevent me from assessing the weight of all the bad-faith factors collectively, I cannot find that LHB acted in bad faith as a matter of law and thus deny the parties' cross-motions for summary judgment on Axon's cybersquatting claim.

## C.   Laches does not bar Axon's cybersquatting claim.

LHB also seeks summary judgment on its laches defense that Axon's cybersquatting claim is equitably barred because Axon has been aware of LHB's use of tasers.org for over 20 years.[178]  The doctrine of laches is an equitable time limitation that precludes a party from filing a claim if, "with full knowledge of the facts, [it] acquiesce[d] . . . and [slept] on [its] rights.'"[179] "To prove laches, the 'defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself.'"[180]  In the context of trademark suits, the Ninth Circuit instructs district courts to balance six factors, known as the *E-Systems* factors, to determine if the trademark owner's delay in filing suit was unreasonable and the defendant suffered prejudice as a result.[181] While the record shows that Axon had knowledge of some of the contested domains since at

---

[178] ECF No. 59 at 23.

[179] *Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1121, 1126 (9th Cir. 2012) (quoting *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950–51 (9th Cir. 2001)).

[180] *Id.* (quoting *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000)).  *See also Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass.*, 465 F.3d 1102, 1108 (9th Cir. 2006) ("The party asserting laches must demonstrate that it has suffered prejudice as a result of the plaintiff's unreasonable delay in filing suit.") (internal quotations omitted).

[181] *Tillamook*, 465 F.3d at 1108 (citing *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983)).

least 1999,[182] LHB did not analyze any of the *E-Systems* factors or offer evidence that it suffered prejudice from delay.  So I cannot find that Axon's delay was unreasonable as a matter of law, and I deny LHB's request for summary judgment on the cybersquatting claim based on a laches defense.

### Conclusion

IT IS THEREFORE ORDERED that the parties' cross-motions for summary judgment **[ECF Nos. 59, 61] are GRANTED in part and DENIED in part**:

Summary judgment is granted in favor of Axon on:

> (1)     LHB's genericide affirmative defense;
>
> (2)     LHB's first-sale-doctrine affirmative defense; and
>
> (3)     the portion of Axon's false-advertising and deceptive-trade-practices claims based on LHB's affiliation statements.  LHB and its affiliates are permanently enjoined from making statements claiming sponsorship by or affiliation with Axon or ownership of any of Axon's marks.

Summary judgment is granted in favor of LHB on the portion of Axon's false-advertising claim based on product-superiority statements.

The motion is DENIED in all other respects.

Axon's trademark-infringement, false-designation-of-origin, and cybersquatting claims proceed to trial.  Axon's false-advertising claim proceeds, but only as to LHB's refurbishment-quality statements.  And Axon's state deceptive-trade-practices claim proceeds, but only as to LHB's logo-and-mark use, quality-of-goods, and product-superiority/disparagement statements.

---

[182] ECF No. 59 at 23 (citing ECF No. 60 at 5, 21).

IT IS FURTHER ORDERED that **this case is REFERRED to the magistrate judge for a MANDATORY SETTLEMENT CONFERENCE**.  The parties' obligation to file their joint pretrial order is STAYED until 10 days after that settlement conference.

_____
U.S. District Judge Jennifer A. Dorsey
July 19, 2023

38